# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**WANDA ESTRADA, WALTER** )
**ESTRADA, J.E, NATALIE ESTRADA,** )
**CARMEN BADILLO, and** )
**JOSE BURGOS, individually and** )      **Civil No.**
**on behalf of all other persons similarly** )      **12-30020-FDS**
**situated,** )
)
       **Plaintiffs,** )
)
       **v.** )
)
**PROGRESSIVE DIRECT INSURANCE** )
**COMPANY,** )
)
       **Defendant.** )
)
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a putative class action alleging unfair and deceptive practices in the online sale of

automobile-insurance policies. Plaintiffs Wanda Estrada, Walter Estrada, J.E., Natalie Estrada,

Carmen Badillo, and Jose Burgos purchased automobile insurance from defendant Progressive

Direct Insurance Company.[1] Plaintiffs were all denied personal-injury-protection ("PIP")

benefits by defendant after they were involved in automobile accidents because they purchased

insurance policies with an $8,000 PIP deductible. Plaintiffs have brought suit against

Progressive, contending that they only purchased policies with a deductible because of

---

[1] Plaintiffs have agreed to voluntarily dismiss the claims of plaintiffs Alexander Sierra, Angel Santa, and Armando Robles.

defendant's unfair and deceptive practices.  The complaint alleges violations of Mass. Gen. Laws

chapters 93A, 176D, and 175.  Jurisdiction is based on diversity of citizenship.

Defendant has filed two motions for summary judgment:  one against plaintiffs who

purchased their insurance by telephone and one against plaintiffs who purchased their insurance

through defendant's website.[2]

For the following reasons, the motion for summary judgment against the telephone

plaintiffs will be granted, and the motion for summary judgment against the website plaintiffs

will be granted in part and denied in part.

## I.  Background

### A.  Factual Background

#### 1.  Personal-Injury-Protection Insurance

In 1971, Massachusetts instituted no-fault automobile insurance.  The purpose of the new

scheme was "to reduce the number of small motor vehicle tort cases being entered in the courts

of the Commonwealth, to provide a prompt, inexpensive means of reimbursing claimants for out-

of-pocket expenses, and to address the high cost of motor vehicle insurance in the

Commonwealth."  *Flanagan v. Liberty Mut. Ins. Co.*, 383 Mass. 195, 198 (1981).

As a part of the statutory scheme, every automobile insurance policy in Massachusetts

must provide PIP coverage.  Mass. Gen. Laws ch. 90, § 34M.

> Under [Mass. Gen. Laws ch.] 90, § 34A, three types of PIP benefits are available:
> (1) medical-related expenses, (2) seventy-five per cent of actual lost wages, and (3)
> replacement services, that is, payments to someone outside of the household who has
> been hired to perform ordinary and necessary services that "the injured person would
> have performed not for income but for the benefit of his . . . household."

---

[2] Plaintiffs have moved to strike three paragraphs of defendant's statement of material facts and the exhibits
on which they are based.

*Creswell v. Medical West Comm. Health Plan, Inc.*, 419 Mass. 327, 328-29 (1995) (alterations in original) (quoting Mass. Gen. Laws ch. 90, § 34A). The statute requires insurers to offer at least $8,000 in PIP benefits. Mass. Gen. Laws ch. 90, § 34A.[3]

If an insured party has health insurance, "the automobile insurer [is] . . . responsible for the first $2,000 of medical-related expenses, after which the injured party's health insurer, if any, would cover the expenses. Additional medical-related expenses not covered by the health insurer [are] paid by the PIP carrier up to $8,000." *Creswell*, 419 Mass. at 330. Other PIP benefits, such as benefits for lost wages and replacement services, are payable by the PIP insurer up to $8,000 whether or not the insured has health insurance. *See* Mass. Gen. Laws ch. 90, § 34A.

Under the statute, "[e]very owner, registrant, operator, or occupant of a motor vehicle to which [PIP] benefits apply," is

> made exempt from tort liability for damages because of bodily injury, sickness, disease or death arising out of the ownership, maintenance or use of such motor vehicle to the extent that the injured party is, or would be had he or someone for him not purchased a deductible authorized by this section, entitled to recover under those provisions of a motor vehicle liability policy or bond that provide [PIP] benefits or from the insurer assigned.

*Id.* Put differently, "the accident victim loses his right to recover in tort to the extent he is eligible for [PIP] benefits." *Pinnick v. Cleary*, 360 Mass. 1, 8 (1971).

The statute allows the insured to select a PIP "deductible" of $100, $250, $500, $1,000, $2,000, $4,000, or $8,000. Mass. Gen. Laws ch. 90, § 34M. That deductible reduces the amount

---

[3] The Massachusetts statutes governing PIP coverage are unusually difficult to read and understand, even by the relatively low standards of legislative enactments. The Supreme Judicial Court in *Flanagan* noted that the definition of "personal injury protection" in ch. 90, § 34A begins with a single sentence containing more than 600 words. 383 Mass. at 198.

of PIP coverage a person receives.  *Id.*  For example, a person who selects a deductible of $8,000 receives no PIP coverage at all.  *See Commerce Ins. Co. v. Scarcella*, 8 Mass. L. Rptr. 465, at *1 (Mass. Super. Ct. Jun. 3, 1998) ("At the time Scarcella purchased the policy from Commerce, he chose a deductible of $8,000, thereby waiving the entirety of his PIP coverage . . . ."); *Mallegol v. Divino*, 2007 Mass. App. Div. 62, at *1 (Mass. Dist. Ct. 2007) ("[B]y virtue of the plaintiff's election of a deductible of $4,000.00 only $4,000.00 of the medical bills were paid by his insurer . . . .").

An accident victim who has a PIP deductible has "no right to claim or to recover any amount so deducted from any owner, registrant, operator or occupant of a motor vehicle . . . who is made exempt from tort liability by this section."  Mass. Gen. Laws ch. 90, § 34M.  As a practical matter, that means that a tortfeasor who causes an automobile accident is immune from liability for $8,000 in damages covered by PIP, even if the accident victim received less than $8,000 because of his or her PIP deductible.  *See Mallegol*, 2007 Mass. App. Div. 62, at *1-2 ("We think it plain that the tortfeasor is entitled to an off-set up to the maximum of $8,000.00 for medical expenses resulting from an accident, regardless of any deductible chosen by the policyholder.").  For example, an individual with a $4,000 PIP deductible would receive up to $4,000 in PIP benefits and would have his or her maximum tort recovery limited by $8,000.  *See id.*  An individual with a $8,000 deductible would receive no PIP benefits and would also have his or her maximum tort recovery limited by $8,000.  *See Scarcella*, 8 Mass. L. Rptr. 465, at *1.

## 2. <u>Progressive Enters the Massachusetts Insurance Market</u>

Progressive Direct Insurance Company has been selling automobile insurance since 1937.  (Def. SMF ¶ 3).  In 1997, it became the first insurer to sell automobile insurance online.  (*Id.* ¶ 5).  By 2007, it sold insurance in every state in the United States except Massachusetts.  (*Id.* ¶ 4).

In November 2007, Progressive decided to enter the Massachusetts automobile insurance market.  (Pl. SMF ¶ 1).  According to plaintiffs, Progressive wanted to enter the Massachusetts market quickly in order to capture a larger market share than other national automobile-insurance companies such as GEICO.  (*Id.* ¶ 2-4).  It designed its Massachusetts website in late 2007 and early 2008.  (Def. SMF ¶ 12).

Progressive based its Massachusetts website on the website it had designed for Ohio.  (Pl. SMF ¶ 5).  Ohio insurance law, however, differed from Massachusetts insurance law in several respects; one difference was that it did not include PIP coverage.  (*Id.* ¶ 7).  As a result, Progressive had to add some Massachusetts-specific details and requirements to the website, including PIP coverage.  (Def. SMF ¶¶ 12-13).  According to plaintiffs, Progressive intended to handle PIP coverage in Massachusetts as it had in Florida, a state that also required PIP coverage.  (Pl. SMF ¶ 9).  Under Florida law, PIP insurance covered up to $10,000 in benefits, and it was customary to recommend a $1,000 deductible.  (*Id.* ¶ 10).  On Progressive's Florida website, customers could select the amount of the deductible and the persons to whom the deductible applied.  (*Id.* ¶ 11).

On May 1, 2008, Progressive launched its Massachusetts website, which enabled it to sell automobile-insurance policies online directly to Massachusetts customers.  (Def. SMF ¶ 18).

5

The Massachusetts Division of Insurance did not review the website before it was launched.  (Pl. SMF ¶ 16).

### 3. Progressive's Massachusetts Website from 2008-2010

Progressive's Massachusetts website was available at www.progressive.com.  (Def. SMF ¶ 51).  In 2008, "the website presented customers with a series of questions on successive web pages, including questions on (1) the customer's biographical and demographic information; (2) the make, model, and year of the customer's vehicles; (3) the identity of any insured drivers, and (4) any recent accident history."  (*Id.* ¶ 52).

Progressive asked customers using the site how many household members they had.  (Pl. SMF ¶ 39).  A customer could click on a hyperlink entitled "Number of Household Members," which would open a pop-up window stating, "Number of Household Members:  Please include all members of the household including members that are under the driving age and yourself.  This information will be used to recommend a Personal Injury Protection (PIP) coverage which best suits your needs."  (*Id.* ¶ 40).  It also asked customers if they and their household members had health insurance.  (*Id.* ¶ 35).

Customers had the option of speaking to a trained insurance representative at any time.  (Def. SMF ¶ 84).  A sidebar labeled "Help Center" was placed on the right side of each page of the website, featuring the picture of a licensed insurance representative.  (*Id.* ¶¶ 85-86).  If a customer clicked on the Help Center, it displayed telephone and e-mail contact information, featured hyperlinks with answers to common questions, and included a hyperlink to a printable summary of the consumer's price quote.  (*Id.* ¶¶ 87-91).

## 4.    **Progressive's PIP Defaults**

If customers using the website indicated that they and their household members all had health insurance, Progressive generated plans and quotes that included an $8,000 PIP deductible. (Pl. SMF ¶ 38).  If customers indicated that they or their household members did not have health insurance, Progressive generated plans and quotes with no PIP deductible.  (*Id.* ¶ 37).  Progressive did not ask whether the customer had insurance that included other areas covered by PIP, such as disability insurance.  (Pl. Resp. to Def. SMF ¶ 58).  Progressive contends that it set up the website this way to save customers money, so that they would not purchase duplicate insurance.  (Wilton-Brancsch Decl. ¶¶ 6-12).[4]

After a customer answered the questions, the website used those answers to generate tabs with a series of coverage options.  (Pl. SMF ¶¶ 33, 42).  Between 2008 and 2010, those tabs were labeled "basic," "choice," "economy," "plus," "recommended," and "value."  (*Id.* ¶ 43).  Progressive defined the "recommended" coverage plan as the one "most often bought nationally," but did not tell customers that was how it was defined.  (*Id.* ¶ 44).

The packages could be viewed side-by-side in columns.  (Def. SMF ¶ 63).  In the four-tab view, the different types of coverages were listed vertically in rows.  (*Id.* ¶ 67).  The title of each coverage contained a hyperlink that would generate a pop-up window displaying Progressive's help text for that coverage.  (*Id.* ¶¶ 67-68).  The hyperlink for PIP coverage read as

---

[4] The DOI's 2008 "Ways to Save Manual" states as follows:

> You can save on your premium by excluding yourself, or yourself and household members, from some or all of [PIP] coverage.  You should consider this option if you have a medical and disability income plan.  The portion of each claim you have agreed not to be covered for is called a "deductible."

(Mangini Aff., Ex. 18 P0007785).

follows:

> Personal Injury Protection (PIP) (Part 2)
>
> The state of Massachusetts requires you to carry Personal Injury Protection coverage to protect a driver or passengers injured in a vehicle and to pedestrians injured by your vehicle, regardless of fault. These coverages include up to $8000 per accident for:
>
> 1.    Medical expenses
>
> 2.    Work Loss Benefits: Loss of earnings from work
>
> 3.    Replacement Services: payments for household services incurred within 2 years after the accident.
>
> The insured can choose up to an $8000 deductible. This applies to the named insured and family members, but does not apply to guest passengers or pedestrians.

(*Id.* ¶ 69).

To the right of each coverage title was a drop-down menu that displayed the limits or deductibles for that type of coverage. (*Id.* ¶ 70). To change from one limit or deductible to another, a customer could drop down the menu by clicking on the box, and then scroll through the options to make a new selection. (*Id.* ¶ 71).

The PIP coverage section had two drop-down menus. (*Id.* ¶ 73). The first contained two options, "Named Insured" and "NI & Household Members." (*Id.* ¶¶ 73, 76-77). The second drop-down menu allowed customers to choose one of the eight deductible amounts allowed by Massachusetts law, ranging from $0 to $8,000. (*Id.* ¶¶ 73, 75). If changing an option in one of the drop-down menus changed the premium on the insurance coverage, that change was displayed on the website. (*Id.* ¶ 78).

If a customer chose "NI & Household Members" with an $8,000 deductible, that deductible applied to the customer and his or her household members. (Pl. SMF ¶¶ 59, 61). As

a practical matter, that meant the insured and his or her household members had no PIP coverage at all. (*See id.*). If a customer chose "Named Insured" with an $8,000 deductible, that deductible applied to the customer but not to his or her household members. (*Id.*). That meant the insured had no PIP coverage but his or her household members had the full $8,000 coverage. (*See id.*). A Progressive representative has acknowledged that it would always be advantageous for a consumer who did not live alone to obtain that coverage for his or her household members. (Quigg Dep. at 234).

There was no premium difference between selecting "Named Insured" with an $8,000 deductible and selecting "NI & Household Members" with an $8,000 deductible. (Def. SMF ¶ 79; Pl. SMF ¶¶ 59, 61). In other words, a customer could purchase $8,000 PIP coverage for household members for no additional cost.

Between 2008 and 2010, Progressive defaulted its customers to "NI & Household Members" with an $8,000 deductible if they indicated that they had health insurance. (Pl. SMF ¶ 38). It was not customary at the time in Massachusetts for an insurance company to recommend an $8,000 PIP deductible, whether or not the customer had health insurance. (Quigg Dep. at 205).

Progressive never explicitly informed customers that the two coverage options cost the same. (Pl. SMF ¶ 61). However, a customer going back and forth between the two options on the website would see the same premium price. (Def. Resp. to Pl. SMF ¶ 61). The website also said that different deductibles with different coverage policies could yield the same price. (*Id.*).

     **5.**     <u>**Progressive's Application and Policy Materials**</u>

After making their selections, customers of Progressive's website were required to

review and sign an "Application for Massachusetts Motor Vehicle Insurance." (Def. SMF ¶ 93). The application outlined the coverages that the customer selected and was incorporated into the customer's insurance contract. (*Id.* ¶ 94). Online customers were required to sign and certify the truth and accuracy of their answers to the application. (*Id.* ¶ 96). This included the following statements: (1) "I declare that the statements contained herein are true to the best of my knowledge and belief . . . ."; (2) "I understand that this policy may be rescinded and declared void if this application contains any false information or if any information that would alter the Company's exposure is omitted or misrepresented"; (3) "I acknowledge and agree to the statements contained within this application"; (4) "I also acknowledge and agree that by typing my name in the designated boxes on the screen below this form and clicking 'Continue,' I am electronically signing this application, which . . . shall be valid evidence of my intent and agreement to be bound by its terms." (*Id.*).

After the online purchase of an insurance policy, Progressive mailed and e-mailed customers a copy of their insurance policies, a coverage selection page, and other materials. (*Id.* ¶ 99). Among the additional materials was information about what type of PIP deductible the customer had purchased. (*Id.* ¶ 103).

Progressive's customers could make changes to their coverage selections at any time, either online or by calling a Progressive sales representative. (*Id.* ¶ 104). They also had the right to cancel their policies at any time. (*Id.* ¶ 105). In internal Progressive documents, a Progressive employee acknowledged that many Massachusetts customers had historically been so greatly penalized for canceling an automobile-insurance policy that they thought it was illegal to do so. (Mangini Aff., Ex. 2 P0003749).

### 6. Early Government Review

#### a. Review of Progressive's Rates

As an insurer in Massachusetts, Progressive was required to submit its premium rates, insurance rule structure, and policy materials to the Massachusetts Division of Insurance ("DOI") for approval. (Def. SMF ¶ 113). It did so five times between 2008 and February 2010. (*Id.* ¶ 115). In its rate filings, Progressive proposed charging the same premium for both the "Named Insured" PIP deductible and the "NI & Household Members" deductible. (*Id.* ¶¶ 118-21). The DOI approved the rates and pricing structure. (*Id.* ¶ 121).

#### b. Early Review of Progressive's Website

The DOI began to examine Progressive's website after its launch on May 1, 2008. (Def. SMF ¶ 23). As part of the DOI's review, DOI employee Cara Blank tested Progressive's website by navigating through the site and purchasing a policy. (*Id.* ¶ 25). She discovered that the website contained incorrect disclosures concerning the use of credit information, marital status, and gender; those errors were subsequently fixed. (Wilton-Bransch Decl. ¶¶ 16, 18). At the time, the DOI did not express any concerns about the portions of the website concerning PIP policies. (*See id.* ¶ 18).

On May 6, 2008, the Massachusetts Association of Insurance Agents (the "MAIA") wrote letters to the Massachusetts Attorney General and Commissioner of Insurance expressing concerns about Progressive's website. (Def. SMF ¶ 20). The MAIA expressed concerns, among other things, about the $8,000 PIP deductible, stating that the "quote process fails to explain that PIP provides benefits that may not be provided by health insurance — like the cost of replacement services, lost wages, dental service, professional nursing and funeral services." (*Id.*

¶ 21).  It requested that the DOI shut down Progressive's website until it complied with all DOI regulations.  (*Id.* ¶ 22).

The Massachusetts Office of the Attorney General began examining Progressive's website in response to the MAIA's letter.  (*Id.* ¶ 27).  During May and June of 2008, Assistant Attorney General Peter Leight had three telephone conferences with Progressive about its website.  (*Id.* ¶ 29).  During these conferences, Leight asked Progressive to include more detail in its descriptions of various coverages on its website, including PIP.  (*Id.* ¶¶ 31-33).  Progressive did not want to do so, contending that its preference was for customers to contact a trained, licensed insurance professional if they had questions instead of reading long coverage descriptions.  (*Id.* ¶ 35).

On July 1, 2008, Progressive sent an e-mail to Leight responding to his concerns.  (Moores Decl., Ex. 13).  The e-mail stated that Progressive and Leight agreed not to change the language regarding coverage descriptions on the website, but that they could continue further negotiations if the AG's office became aware of significant customer confusion in the future.  (*Id.* ¶ 3).  After July 1, 2008, the AG's office never asked to reopen the negotiations or inform Progressive of any customer confusion.  (Def. SMF ¶ 39).  In particular, the AG's office never asked Progressive to change its policy regarding PIP and never required that the website be revised to include additional PIP disclosures.  (*Id.* ¶ 40).

### 6. __Evidence of Customer Confusion__

According to plaintiffs, there is evidence that Progressive knew in 2008 that the PIP deductible was confusing to customers.  Progressive knew that PIP deductibles were not customary in Massachusetts automobile-insurance plans.  (Pl. SMF ¶ 22).  Approximately 90

percent of Massachusetts insureds purchased PIP with no deductible, and standard practice in Massachusetts was to sell $8,000 of PIP coverage with no deductible whether or not the customer had health insurance. (*Id.* ¶¶ 23-24).

In June 2008, Progressive held a focus group that found that as to the PIP deductible, "customers don't know [or] understand this at all and it is hard to explain." (Mangini Aff., Ex. 20 P0010484). The focus group concluded that because it was only a $3 difference for the deductible, Progressive should "just put a zero deductible and don't even go there with the customer." (*Id.*).

In addition, a May 30, 2008 internal Progressive e-mail contains a comment from a customer that stated that the customer mistakenly chose an $8,000 PIP deductible instead of a limit of $8,000 of PIP coverage, but was able to fix it before the insurance policy was finalized. (Mangini Aff, Ex. 5). Another internal Progressive e-mail sent on July 14, 2008, stated that customers did not understand that Progressive's website normally selected an $8,000 PIP deductible while other companies showed that they had an $8,000 PIP coverage limit. (*Id.*). In a July 23, 2008 response to that e-mail, a Progressive employee stated that the $8,000 limit was in the help text, but that "we know no one clicks thr[o]u[gh] there." (*Id.*). In that same July 23 e-mail, the Progressive employee stated that it was unclear whether Massachusetts customers understood that PIP automatically provided $8,000 in coverage, and that the only options they were choosing were the amount of the deductible and what persons would be covered by that deductible. (*Id.*).

In 2009, Progressive began receiving formal complaints through the DOI from customers who had bought insurance with an $8,000 deductible but believed they had been buying $8,000 in PIP coverage. (Mangini Aff., Ex. 39). On January 26, 2010, Progressive representatives met

with the DOI to address those concerns. (Def. SMF ¶ 45). At the meeting, DOI representatives requested that Progressive change the website, either to ask if the insured wanted a deductible or to recommend no deductible. (Mangini Aff., Ex. 23).

Progressive opposed that request, arguing among other things that there was a business risk to selling more "base packages" (that is, insurance policies that included, among other things, no PIP deductible) because the package was underpriced by 64 percent. (*Id.*; Pl. SMF ¶ 68).[5] PIP insurance had the highest loss ratio for Progressive of any of its coverages, and the company had a gross loss of $1 million per quarter on policies with no PIP deductible in 2010. (Pl. SMF ¶¶ 49-50).

Ultimately, the DOI and Progressive compromised, and agreed that Progressive would add the following language every time a customer selected coverage with a PIP deductible: "Your PIP coverage currently includes a deductible. You may elect a deductible of up to $8,000 or no deductible." (Mangini Aff., Ex. 23 P0007062). The language was placed on the website on April 27, 2010. (Def. SMF ¶ 48).

On the same day, Progressive changed the website, so that the default position for customers with health insurance was a $250 PIP deductible instead of an $8,000 deductible. (Moores Decl., Ex. 17 P000823). That change was, in part, a response to the complaints Progressive had received about the deductible. (Quigg Dep. at 202-03). After the change, Progressive's loss ratio on PIP coverage (the amount of money paid out in claims paid divided by the amount of money collected in premiums) changed from approximately 2.08 to 1.20. (Def. SMF ¶ 50).

---

[5] A "base package" is one containing the minimum limits of liability: $20,000 per person and $40,000 per accident in bodily injury limits, $5,000 in property damage, and no PIP deductible. (Pl. SMF ¶ 72).

### 7. The Individual Plaintiffs

#### a. The Estradas

Walter Estrada is a resident of Holyoke, Massachusetts. (Walter Estrada Aff. ¶ 1). He lives with his wife, Wanda, and three children. (*Id.*). On August 3, 2009, Walter Estrada purchased an automobile-insurance policy through Progressive's website. (Pl. SMF ¶ 81). The policy was purchased in Wanda Estrada's name, and both Walter and Wanda were listed as the named insureds for the policy. (*Id.*).[6] The only vehicle covered by the policy was a 1999 Ford Windstar van. (Def. Supp. SMF ¶ 224).

When navigating the Progressive website, Walter Estrada indicated that all the members of his household were covered by health insurance. (Pl. SMF ¶ 82). As a result, the coverages that the website offered him all contained an $8,000 PIP deductible for the named insureds and their household members. (Pl. SMF ¶ 83; Def. SMF ¶ 150). Walter Estrada did not know what a deductible was or how it would affect him if he got into an automobile accident. (Pl. SMF ¶ 84). Progressive did not explicitly tell him that he could obtain no-deductible PIP coverage for the members of his household for the same premium, although the website did show that result if the coverage options were changed. (*Id.* ¶ 86; Def. Resp. to Pl. SMF ¶ 86).

When they purchased the insurance policy, the Estradas did not access any information about PIP on Progressive's website, read the insurance-policy contract, or read the coverage-selection pages. (Def. SMF ¶¶ 154-55). At his deposition, Walter Estrada testified that he "was just looking for a cheap price" and was "looking for the cheapest" when he bought the automobile-insurance policy from Progressive. (Walter Estrada Dep. at 75:24, 87:16). He also

---

[6] Wanda Estrada does not read English well. (Def. SMF ¶ 151).

testified that he thought all the policies were the same.  (*Id.* at 73:23-74:3).

On August 7, 2009, Walter, Wanda, and two of their children (Natalie and J.E.) were involved in an automobile collision.  (Pl. SMF ¶¶ 89-93).  Their car was totaled as a result of the accident.  (*Id.* at 93).  At the time of the accident, Natalie and J.E. were 16 and 14 years old, respectively.  (*Id.* ¶¶ 94-95).  All four Estradas suffered personal injuries in the collision.  (*Id.* ¶¶ 96-99).  As a result, all incurred medical expenses:  Walter incurred $7,400, Wanda incurred $3,050, Natalie incurred $4,486.25, and J.E. incurred $4,734.30.  (*Id.* ¶¶ 100-03).  At the time, the Estradas were covered by their Progressive automobile-insurance policy and a health-insurance policy through MassHealth and Network Health.  (*Id.* ¶¶ 88, 109).

On August 14, a claim for PIP benefits was sent to Progressive on behalf of the Estradas.  (*Id.* ¶¶ 104-107).  On August 21, Progressive denied the PIP claims, stating that they were not covered because the Estradas had selected an $8,000 PIP deductible when purchasing their policy.  (*Id.* ¶ 108).  MassHealth and Network Health paid for a portion of the Estradas' medical expenses.  (*Id.* ¶ 110).

On January 8, 2010, Progressive sent the Estradas a renewal coverage-selections page, which stated what coverage, limits, and policy would apply if they renewed their automobile-insurance policy with Progressive.  (Def. Supp. SMF ¶ 225).  The page stated that the renewal policy would cover the Estradas' 1999 Ford Windstar van and would begin on February 3, 2010.  (*Id.* ¶¶ 226-27).  It also stated that the policy would contain an $8,000 PIP deductible for the named insured and his or her household members.  (*Id.*).  At the same time, Progressive sent the Estradas a payment schedule for renewal of the policy indicating that it would withdraw money from Wanda Estrada's bank account.  (*Id.* ¶ 228).  The expected withdrawal dates were February 3, March 3, and April 3, 2010.  (*Id.*).

16

On January 27, 2010, before their Progressive automobile-insurance policy expired, Walter and Wanda Estrada purchased an automobile-insurance policy from Encompass Insurance. (Pl. SMF ¶ 116). That policy covered a 1997 Dodge van and a 1998 Saturn station wagon, and had no PIP deductible. (Def. Supp. SMF ¶ 230).

On February 3, Progressive attempted unsuccessfully to withdraw a payment from Wanda Estrada's bank account. (*Id.* ¶¶ 232-33). On February 15, it e-mailed the Estradas a notice of non-payment, and sent them a cancellation notice the next day. (*Id.* ¶¶ 234-35).

On February 17, Walter Estrada called Progressive and made a payment on the renewal of the insurance policy. (*Id.* ¶ 236).[7] He authorized an immediate payment to keep the Progressive policy in force. (*Id.* ¶ 237). He also acknowledged that Progressive would be automatically withdrawing future payments from his wife's checking account. (*Id.* ¶ 239). He did not discuss the coverage on the policy with Progressive during that call. (*Id.* ¶ 238). The Estradas continued to make payments on their renewed policy until April 2010. (*Id.* ¶ 244; Pl. SMF ¶ 118). They contend they did so because the payment was automatically withdrawn from their account. (Walter Estrada Aff. ¶ 31).

On December 29, 2010, and February 10, 2011, the Estradas' tort claims arising out of the collision were settled. (*Id.* ¶¶ 111-114). Walter Estrada's claim settled for $4,000. (*Id.* ¶ 111). Liens from Mass Health and Network Health of $227.54 and $541.61, respectively, were paid out of the settlement. (*Id.*). Walter Estrada had $3,090 in medical expenses that were not covered by his health insurance, which were negotiated down to $856 and paid out of the

---

[7] Plaintiffs admit that the telephone call took place at some point in time, but contend that the evidence does not contain a specific date. (Pls.' Resp. to Def.'s Supplemental SMF ¶ 236). The exhibit, however, contains evidence that the telephone call occurred on February 17. (Moores Supplemental Decl. Ex. 73 at 4:10).

settlement.  (*Id.*).  Wanda Estrada's claim settled for $3,100.  (*Id.* ¶ 112).  Network Health asserted a lien of $1,442.01, which was negotiated to $600 and paid out of the settlement.  (*Id.*).  J.E.'s claim settled for $3,100.  (*Id.* ¶ 113).  A MassHealth lien of $219.38 was paid out of the settlement, along with $400 in unpaid medical expenses.  (*Id.*).  Natalie Estrada's tort claim settled for $3,000.  (*Id.* ¶ 114).  A MassHealth lien of $277.54 and $562 in unpaid medical expenses were paid out of the settlement.  (*Id.*).

### b.  Carmen Badillo and Jose Burgos

Carmen Badillo and Jose Burgos are residents of Chicopee, Massachusetts.  (Badillo Aff. ¶ 1; Burgos Aff. ¶ 1).[8]  On May 7, 2009, Badillo called Progressive and spoke to a Progressive employee.  (Def. SMF ¶ 195).  Before calling Progressive, Badillo had visited Progressive's website.  (*Id.* ¶ 196).  When Progressive asked Badillo whether she had obtained a quote online, she said she did not understand the online form.  (*Id.* ¶ 197).  When Badillo was asked whether she purchased anything online, she said, "I don't purchase nothing on-line.  I don't trust it." (*Id.* ¶ 198).

During Badillo's May 7 telephone conversation with Progressive, they discussed (1) the vehicle she intended to insure; (2) her household members; and (3) her coverage and deductible selections.  (*Id.* ¶¶ 200, 203-04).  The Progressive representative also provided basic explanations of liability coverage, bodily injury coverage, and uninsured motorist coverage.   As part of that conversation, the Progressive representative told Badillo specifically that "you also have personal injury protection, which means everybody – everybody's policy pays for their own medical first, and you have that with an $8,000 deductible."  (Moores Decl., Ex. 64 at 6:5-10).

---

[8] Badillo and Burgos live together, but are not married.  (Burgos Aff. ¶ 1).

The representative did not explicitly tell Badillo how having an $8,000 PIP deductible would affect her coverage. (*See generally id.*). Badillo told the representative that she would need to call back with payment information to complete her purchase. (Def. SMF ¶ 206).

On June 1, 2009, Badillo called Progressive and purchased an automobile-insurance policy over the telephone. (*Id.* ¶ 207). The Progressive representative again went over Badillo's coverage with her, this time telling her, "You have personal injury protection of 8,000." (Mangini Aff., Ex. 34 at 20:8-9; *see also* Def. SMF ¶ 209).

Badillo completed her purchase for an automobile-insurance policy during the June 1 call. (Def. SMF ¶ 211). Her policy had an $8,000 PIP deductible. (*Id.* ¶ 212). Progressive did not, at any time, explain to her what a PIP deductible was or how it would work if she were involved in an accident. (Pl. SMF ¶ 127). It also did not tell her that she could, for the same premium, obtain insurance coverage with no PIP deductible for her household members. (*Id.* ¶ 130). Badillo contends that if she had known the impact of a PIP deductible, she would have requested no deductible for herself and her household members. (*Id.* ¶ 131-32).

On June 3, 2011, Badillo and Burgos were involved in a motor-vehicle collision. (*Id.* ¶ 133). As a result, they suffered personal injuries requiring medical treatment. (*Id.* ¶¶ 134-35). Badillo incurred $8,045.27 in medical expenses and Burgos incurred $5,541.23 in medical expenses. (*Id.* ¶¶ 136-37).

On June 19, a claim for PIP benefits was sent to Progressive on their behalf. (*Id.* ¶ 138). On June 23, Progressive denied their claims because Badillo had an $8,000 PIP deductible in her policy that applied to both her and her household members. (*Id.* ¶ 139).[9]

---

[9] Defendant asserts that their PIP claims were denied on June 6. (*See* Moores Decl., Ex. 67; Def. SMF ¶ 222). The date is immaterial to the analysis in this case.

At the time of the June 3 collision, Badillo and Burgos had health insurance through Boston Medical Center Healthnet. (*Id.* ¶ 140). Their medical expenses were paid by their health insurance. (*Id.* ¶ 141).

On February 10, 2012, Badillo and Burgos settled their tort claims arising out of the June 3 collision. (*Id.* ¶¶ 142-43). Badillo's claim settled for $6,500; $1,500 of the settlement was paid to Healthnet after it asserted a medical lien on the settlement. (*Id.* ¶ 142). Burgos's claim settled for $5,000; $750 of the settlement was paid to Healthnet after it asserted a medical lien on the settlement. (*Id.* ¶143).

Badillo contends that she was unaware that she had the option of canceling her insurance policy earlier than its renewal date. (*Id.* ¶ 144). She did not renew her policy after it lapsed in December 2011, instead buying a policy through Liberty Mutual without an $8,000 PIP deductible. (*Id.* ¶ 145).

###### B.    Procedural Background

On July 13, 2011, Alexander Sierra sent a demand letter to Progressive pursuant to Mass. Gen. Laws ch. 93A, § 9(3), on his own behalf and on behalf of other similarly situated customers. (Pl. SMF ¶146). The complaint in this case was filed on January 6, 2012 by Sierra in the Hampden Superior Court. Progressive removed the case to this Court on January 27. On December 4, 2013, the Estradas sent a Chapter 93A demand letter to Progressive. (Pl. SMF ¶ 147).

The complaint was amended three times, most recently on January 30, 2014. The final amended complaint alleged that Progressive committed unfair and deceptive business practices when selling insurance on its website. It also alleged a putative class action under Fed. R. Civ. P. 23, stating as follows:

20

The Class is composed of at least a few thousand people, the joinder of whom is impracticable except by means of a class action. The disposition of their claims in a class action will benefit the parties and the Court. Defendant sells thousands of insurance policies per month through its website, and thus the Class is sufficiently numerous to make joinder impracticable, if not completely impossible.

(Third Am. Compl. ¶ 93).

On March 28, 2014, Progressive filed two motions for summary judgment, one concerning those plaintiffs who bought their insurance through its website and one concerning those plaintiffs who bought their insurance policies over the telephone.[10]

## II.    Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the non-moving party. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[10] Plaintiffs have moved to strike three paragraphs of defendant's statement of material facts and the exhibits they are based on. Because the Court did not rely on those paragraphs or exhibits in this decision, the motion will be denied as moot.

250 (1986) (internal quotation marks omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id*. at 256-57.

III.   **Analysis**

   A.    **Policies Sold by Telephone**

Defendant has moved for summary judgment against plaintiffs Badillo and Burgos, contending that because Badillo purchased her insurance policy over the telephone, they cannot recover under the theory of liability outlined in the third amended complaint, which is limited to insurance policies purchased online.[11]  Plaintiffs contend that their theory of liability is "not limited to purchases over Progressive's website and include[s], more generally, [d]efendant's failure to disclose material facts during the purchase of insurance over the phone regarding PIP insurance, and the recommending of consumers towards the purchase of PIP insurance with an $8,000 deductible."  (Pl. Opp. at 5).

The third amended complaint alleges unfair and deceptive practices relating to the sale of insurance policies on defendant's website.  It does not contain a single allegation concerning defendant's sale of insurance policies over the telephone; all 22 paragraphs of the complaint's general allegations concern the website.  (*See* Third Am. Compl. ¶¶ 16-37).  Indeed, the heading for that section is "Defendant's Website."  (*Id.* at 3).  The remainder of the factual allegations essentially allege that individual plaintiffs purchased insurance from defendant and were injured by that purchase.  Finally, the "Class Action Allegations" section of the complaint includes, in its

_____

[11] Originally, the "telephone plaintiffs" included Alexander Sierra, Carmen Badillo, and Jose Burgos. Plaintiffs have since agreed to voluntarily dismiss Sierra from the case, leaving the claims of Badillo and Burgos. Accordingly, "plaintiffs" in this section refers to Badillo and Burgos.

description of the putative class, that "[d]efendant sells thousands of insurance policies per month *through its website*, and thus the [c]lass is sufficiently numerous to make joinder impracticable, if not completely impossible." (*Id.* ¶ 93 (emphasis added)).

Plaintiffs cannot now introduce an entirely new theory of liability in their summary judgment papers. *See Diomed, Inc. v. Vascular Solutions, Inc.*, 417 F. Supp. 2d 137, 141 (D. Mass. 2006) (holding that plaintiff that alleged breach of one agreement in its complaint could not raise breach of a different agreement when it was confronted with difficulty in proving its original allegation). In doing so, they "impermissibly seek[] to amend [their] complaint without ever filing a motion for leave to amend pursuant to Fed. R. Civ. P. 15." *Id.*[12]

The First Circuit has noted that "when a plaintiff raises a claim for the first time in response to a summary judgment motion, it is possible to treat the claim as a motion to amend the complaint under Rule 15(a) of the Federal Rules of Civil Procedure." *Kunelius v. Town of Stow*, 588 F.3d 1, 19 (1st Cir. 2009); *see also Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 58 (1st Cir. 2011). However, leave to amend can be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The case is now at the summary judgment stage. At the very least, plaintiffs had multiple opportunities to amend the complaint to add their new theory of liability but failed to do so (and

---

[12] Defendant also points out that claims of orally fraudulent misrepresentations or omissions would be governed by the heightened pleading standards of Fed. R. Civ. P. 9(b), which require a party to "state with particularity the circumstances constituting fraud or mistake." "It is well-established that '[t]his rule entails specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations.'" *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189-90 (1st Cir. 2006) (alterations in original) (quoting *Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991)). The third amended complaint fails to meet those requirements as to the theory concerning deceptive telephone sales.

indeed, failed to do so after three amendments to the complaint). Defendant would also be prejudiced if the new theory requires further discovery. Under those circumstances, leave to amend would not be granted. *See Beane v. Beane*, 856 F. Supp. 2d 280, 298 (D.N.H. 2012) (denying new claims at summary judgment stage where litigant had amended its pleading three times since it was first filed and completely changed his characterization of the claims in question).[13]

Accordingly, defendant's motion for summary judgment against the telephone plaintiffs will be granted.

## B.    Policies Sold Online

The complaint alleges claims of unfair and deceptive practices under Chapter 176D, Chapter 175, and Chapter 93A against defendant for its conduct in selling insurance policies online. Defendant has moved for summary judgment as to all those claims.[14]

### 1.    Chapter 176D Claims

Counts 2 through 5 allege claims for unfair or deceptive business practices in violation of four subsections of Mass. Gen. Laws ch. 176D, § 3.

Chapter 176D does not provide for a private right of action. Instead, claims for violations of the statute may be brought as claims under Chapter 93A. *See Federal Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 34-35 (1st Cir. 2007) ("The Massachusetts Supreme Judicial court has

---

[13] The new theory of liability would also greatly expand the scope the putative class, which could affect any analysis concerning possible certification of the putative class. *See* Fed. R. Civ. P. 23(a)(2) (requiring "questions of law or fact common to the class").

[14] Plaintiffs have agreed to dismiss the claims of named plaintiffs who bought insurance policies from defendant online except for the Estradas. (Pl. Opp'n at 1). Accordingly, "plaintiffs" in this section refers to the Estradas.

concluded that a violation of General Laws chapter 176D, § 3, which defines unfair claim settlement practices in the insurance industry, is evidence of an unfair business practice under chapter 93A, § 2, which would give rise to a cause of action under chapter 93A, § 11." (citing *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 754 (1993)); *Nyer v. Winterthur Int'l*, 290 F.3d 456, 461 n.7 (1st Cir. 2002) ("[T]he legislature amended [C]hapter 93A, granting consumers a private cause of action against insurers who violate [C]hapter 176D."); *Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 157 (1st Cir. 2000) (noting that "conduct that abridges [Chapter 176D] may or may not abridge [Chapter 93A]").[15]  Any stand-alone claim for relief based on a violation of Chapter 176D, not brought under Chapter 93A, fails to state a claim upon which relief can be granted.

Accordingly, defendant's motion for summary judgment will be granted as to plaintiffs' Chapter 176D claims.

## 2.      Chapter 175 Claim

Count 6 alleges a claim for unfair or deceptive business practices in violation of Mass. Gen. Laws ch. 175, § 181.  That statute only creates a private cause of action under circumstances where an insured is "under any policy of life or endowment insurance or the holder of any annuity or pure endowment contract."  *Passatempo v. McMenimen*, 461 Mass. 279, 287 (2012) (quoting Mass. Gen. Laws ch. 175, § 181).  Because this case involves automobile-insurance policies, that statute does not apply.

Accordingly, defendant's motion for summary judgment will be granted as to plaintiffs'

---

[15] The 1979 amendment to Chapter 93A granted a private cause of action to "any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D."  Mass. Gen. Laws ch. 93A, § 9(1); *see also National Union Fire Ins. Co. of Pittsburgh, PA v. West Lake Academy*, 548 F.3d 8, 12 n.2 (1st Cir. 2008).

Chapter 175 claim.

### 3.      Chapter 93A Claim

Count 1 alleges a claim for unfair or deceptive business practices in violation of Mass. Gen. Laws ch. 93A, § 2.  Under that statute, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Mass. Gen. Laws ch. 93A, § 2(a).  In considering whether a particular act or practice is unfair under Chapter 93A, Massachusetts courts "look to '(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen).'" *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243 (1st Cir. 2005) (alterations in original) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (Mass. 1975)).  "An act or practice is 'deceptive' if it has the 'capacity or tendency' to deceive." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 185 (1st Cir. 2009).  "The plaintiff need not necessarily prove actual reliance on a misrepresentation; rather, the plaintiff must prove 'a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception.'" *Id.* (quoting *International Fid. Ins. Co. v. Wilson*, 387 Mass. 841, 850 (1983)).

Defendant contends that none of its practices were unfair or deceptive.  It also contends that its practices were protected by the safe harbor provision of Mass. Gen. Laws ch. 93A, § 3. In response, plaintiffs contend that defendant violated Chapter 93A by recommending that customers with health insurance purchase PIP coverage with an $8,000 deductible, defaulting such customers to an $8,000 deductible, and failing to disclose to customers that they could

purchase PIP insurance with no deductible for their household members at no additional cost.

### a.     Unfair or Deceptive Practices

Plaintiffs first contend that defendant violated Chapter 93A by recommending and defaulting customers with health insurance to plans with an $8,000 PIP deductible. They contend in substance that defendant recommended such deductibles to customers with health insurance, and its website defaulted to such deductibles, because it wanted to improve its profits. They further contend that it did so even though it knew (1) that customers were confused by the options, (2) that the standard practice in Massachusetts was to recommend no deductible, and (3) that customers with an $8,000 deductible would effectively have no PIP coverage.

There is evidence that defendant knew that some customers confused the $8,000 PIP deductible with $8,000 of PIP coverage, and that some customers would not understand the practical implications of an $8,000 deductible (that is, the customer would have no coverage at all). There is evidence that insurers in Massachusetts generally did not recommend policies with $8,000 PIP deductibles, and that the usual practice was to recommend no deductible. And there is evidence that defendant resisted the DOI's request to change its website to recommend no deductible or explicitly ask if the customer wanted a deductible, contending that doing so would make them sell a higher number of less profitable policies.[16] To be sure, there is countervailing evidence; for example, there is no evidence that defendant failed to give any customer the correct deductible requested; the website did not contain any false statements; and plaintiffs

---

[16] Defendant contends that there is no evidence that it willfully or intentionally deceived plaintiffs. It contends that it defaulted customers with health insurance to an $8,000 PIP deductible to save customers money on their premiums. It also contends that because its loss ratio on PIP coverage improved after it started selling plans with lower deductibles, it could not have been financially motivated to sell plans with an $8,000 PIP deductible. That evidence may ultimately defeat a claim for multiple damages, but it is not sufficient, in light of the evidence as a whole, to grant summary judgment on the Chapter 93A claim.

acknowledge that they did not read or rely on any of the representations about PIP coverage on the website. Moreover, defendant did not hold itself out as an adviser or agent that was helping plaintiffs select the right insurance coverage.[17]

There is at least some question whether plaintiffs could make out a Chapter 93A violation based simply on the fact that the website recommended and defaulted customers to policies with an $8,000 deductible instead of no deductible. However, plaintiffs also contend that it was unfair and deceptive for defendant to default customers to a policy that included an $8,000 deductible for both named insureds and their household members when they could have obtained a policy with no deductible on their household members for the same price. According to plaintiffs, the website was deliberately confusing in that regard. There were two drop-down menus on the website: one that allowed a choice between "Named Insured" and "NI & Household Members," and one that allowed a choice between different amounts of deductible. Apparently, if the customer selected "Named Insured," the deductible applied to the named insured but not his or her household members. That is a counterintuitive result; most customers would probably assume that meant household members would receive no PIP coverage under that selection. The website did show the same price for the selection of "Named Insured" with an $8,000 deductible and "NI & Household Members" with an $8,000 deductible, but that information would not help a customer who did not know the difference between the two options. Defendant's website did not explicitly explain the difference or what it meant for

---

[17] Massachusetts law concerning insurance agents is analogous. In Massachusetts, "[t]here is no general duty of an insurance agent to ensure that the insurance policies procured by him provide coverage that is adequate for the needs of the insured.'" *AGA Fishing Grp. Ltd. v. Brown & Brown, Inc.*, 533 F.3d 20, 23 (1st Cir. 2008) (quoting *Martinonis v. Utica Nat'l Ins. Grp.*, 65 Mass. App. Ct. 418, 421 (2006)) (internal quotation marks omitted). In certain special circumstances, the length of the relationship, public representations of expertise, and reliance can create a special duty between an insurance agent and an insured. *See id.* at 23-24. There was no such special relationship or special duty here.

customers.

At this stage, it is not necessary to slice the Chapter 93A claim into separate components. Taken as a whole, there is sufficient evidence to establish that defendant's website had the "capacity or tendency to deceive." *Baker v. Goldman Sachs & Co.*, 949 F. Supp. 2d 298, 307 (D. Mass. 2013) (internal quotation marks omitted). Under the circumstances, that is enough to show a violation under Chapter 93A.

Defendant further contends that plaintiffs cannot prevail on a claim under Chapter 93A because there is no evidence that there was a causal connection between the alleged deception and plaintiffs' loss. *See Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 401 (2004) (*Aspinall I*) (noting that "causation is a required element of a successful [Chapter] 93A claim"). As noted, plaintiffs need not show "actual reliance" on defendant's allegedly deceptive practice. *See Wilson*, 387 Mass. at 850. Instead, they must "prove that the defendant's unfair or deceptive act caused an adverse consequence or loss." *Rhodes v. AIG Domestic Claims, Inc.*, 461 Mass. 486, 496 (2012). Causation is established where the deceptive act or practice "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted." *Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 801 (2006) (alterations in original) (quoting *Aspinall I*, 442 Mass. at 394) (internal quotation marks omitted).

Here, plaintiffs have come forward with evidence that they purchased automobile insurance with an $8,000 PIP deductible for themselves and their household members because they were defaulted to that option by defendant's website. They contend that if defendant had defaulted them differently or explicitly told them they could obtain PIP coverage for their household members for the same price, they would have done so. Because they had large

deductibles, they suffered losses. That is sufficient, under the circumstances, to establish causation on a Chapter 93A claim. *See Rhodes*, 461 Mass. at 497 (stating that under Chapter 93A claim based on insurer's failure to make a prompt, reasonable, settlement offer, "plaintiffs need only prove that they suffered a loss, or an adverse consequence, due to the insurer's failure . . . ; the plaintiffs need not speculate about what they *would* have done with a hypothetical offer that the insurers might have, but in fact did not, make on a timely basis" (emphasis in original)). Whether plaintiffs could have mitigated their loss by researching or contacting defendant about their PIP deductible is a question for trial.[18]

The Chapter 93A claim will therefore survive summary judgment unless defendant's conduct was protected by the statute's exemption provision.

**b.**     **Statutory Exemption**

Mass. Gen. Laws ch. 93A, § 3, provides that "[n]othing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States." Defendant has the burden of proving that its conduct met the exception. *Aspinall v. Philip Morris, Inc.*, 453 Mass. 431, 434 (2009) (*Aspinall II*). A defendant's burden in claiming the exemption is

> . . . a difficult one to meet. To sustain it, a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, a defendant must show that such scheme affirmatively *permits* the practice which is alleged to be unfair or deceptive.

*Commonwealth v. Fremont Inv. & Loan*, 452 Mass. 733, 750 (2008) (quoting *Fleming v.*

---

[18] Defendant also contends that because Walter Estrada renewed his policy with the $8,000 deductible even after he was denied coverage, the deductible was not material to his decision to buy a policy. At a minimum, however, there is a factual dispute as to why Estrada renewed the policy. (*See* Supplemental Moores Decl., Exs. 72, 73; Walter Estrada Aff. ¶ 31).

*National Union Fire Ins. Co.*, 445 Mass. 381, 390 (2005) (emphasis in original)) (internal quotation marks omitted).

Defendant contends that because the DOI and AG's office allowed its website to remain running after they reviewed it, the website was affirmatively permitted by the laws of the Commonwealth. It is true that the DOI and AG's office reviewed the website, looked at the PIP deductible, and made recommendations regarding the website. However, there is no evidence that the DOI or AG's office explicitly approved the manner in which defendant's website defaulted customers to an $8,000 PIP deductible for themselves and their household members.

Absent such explicit acknowledgment and approval, the Court would have to infer, from the general approval, that the AG's office specifically approved of that practice. However, "[i]nferences cannot be the basis for satisfying the defendant['s] heavy burden under the statute." *Aspinall II*, 453 Mass. at 436. Defendant therefore cannot claim the benefit of the statutory exemption. *See Fremont Inv. & Loan*, 452 Mass. at 750 (holding legality of each of four features defendant used insufficient for Chapter 93A statutory exemption where defendant used those features in combination and was unable to show that combination of features was affirmatively permitted); *DiMarzo v. American Mut. Ins. Co.*, 389 Mass. 85, 96 (1983) ("[W]e have rejected the proposition that an act or practice which is authorized by statute cannot constitute an unfair or deceptive practice . . . .").

Accordingly, defendant's motion for summary judgment as to the website plaintiffs will be denied as to the Chapter 93A claim.

**IV.    <u>Conclusion</u>**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED as to the claims of plaintiffs based on telephone transactions; is GRANTED as to Counts 2 through 6;

and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: October 20, 2014                United States District Judge